UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERQUIM, S.A.,

      Plaintiff/Counter-Defendant,

     v.

BERG IMPORTS LLC d/b/a
BERG NUTRITION LLC,

      Defendant/Counter-Plaintiff.

Case No. 21-cv-10665
Hon. Robert H. Cleland
Mag. Judge David R. Grand

_____/

Sarah L. Wixson (P76496)
VARNUM LLP
101 N. Main St., Ste. 525
Ann Arbor, MI 48104
(734) 372-2915
slwixson@varnumlaw.com

Matthew G. Allison
BAKER MCKENZIE LLP
300 E. Randolph St.
Chicago, IL 60601
(312) 861-8000

Attorneys for Plaintiff/
Counter-Defendant

David G. Dragich (P63234)
January A. Dragich (P63108)
THE DRAGICH LAW FIRM PLLC
17000 Kercheval Ave., Ste. 210
Grosse Pointe, MI 48230
(313) 886-4550
ddragich@dragichlaw.com
jdragich@dragichlaw.com

Jeffrey H. Daichman
Jonathan M. Sabin
KANE KESSLER, P.C.
600 Third Ave., 35th Floor
New York, NY 10016
(212) 541-6222
jdaichman@kanekessler.com
jsabin@kanekessler.com

Attorneys for Defendant/
Counter-Plaintiff

_____/

## DEFENDANT/COUNTER-PLAINTIFF BERG IMPORTS LLC, d/b/a BERG NUTRITION LLC'S AMENDED ANSWER, <u>AFFIRMATIVE DEFENSES, AND COUNTERCLAIM</u>

Defendant/Counter-Plaintiff Berg Imports LLC d/b/a Berg Nutrition, LLC ("Berg" or "Defendant" or "Defendant/Counter-Plaintiff") for its Amended Answer, Affirmative Defenses, and Counterclaim, hereby responds to the Complaint of Plaintiff Interquim, S.A. ("Interquim" or "Plaintiff" or "Plaintiff/Counter-Defendant") as follows:

### <u>ANSWER</u>

### <u>NATURE OF ACTION</u>

1.      Denies each and every allegation contained in Paragraph 1 of the Complaint, except admits that this action arises from an oral distribution agreement for the sale of certain dietary and nutritional supplements, including a product called citicoline monosodium sold under the brand name, Xerenoos (the "Distribution Agreement").

### <u>THE PARTIES, JURISDICTION AND VENUE</u>

2.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint and therefore denies same.

3.      Admits the allegations contained in Paragraph 3 of the Complaint.

4.      Paragraph 4 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies each and every allegation contained in paragraph 4 of the Complaint.

5.      Paragraph 5 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies each and every allegation contained in paragraph 5 of the Complaint, except admits that Berg is a resident of this judicial district.

## FACTS COMMON TO ALL COUNTS

6.      Denies each and every allegation contained in paragraph 6 of the Complaint, except admits that Berg and Plaintiff entered into an oral agreement for Berg to act as a distributor in the United States for certain products manufactured by a business unit of Interquim named Ferrer HealthTech.

7.      Denies each and every allegation contained in paragraph 7 of the Complaint, except admits that Berg received a 5% commission on the sale of certain products pursuant to the Distribution Agreement.

8.      Denies each and every allegation contained in paragraph 8 of the Complaint, except admits that beginning in 2014, one of the products covered under the Distribution Agreement was Xerenoos, which is the brand name for a citicoline monosodium supplement manufactured by Interquim.

9.     Denies each and every allegation contained in paragraph 9 of the Complaint, except admits that sales of Xerenoos generated by Berg were sometimes invoiced by Plaintiff to the end customer, that Berg would send the product to the end customer from a stock of Xerenoos provided to Berg by Plaintiff and that when payments were directly paid to Plaintiff from the end customer the Plaintiff would then pay commission amounts to Berg.

10.     Denies the allegation contained in the first sentence of paragraph 10 of the Complaint that for the six years between 2014 and 2020, Berg's total sales of Xerenoos were approximately $2 million and Berg was paid total commissions of almost $100,000. Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegation contained in the second sentence of paragraph 10 of the Complaint and therefore denies same.

11.     Denies each and every allegation contained in paragraph 11 of the Complaint.

12.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint and therefore denies same, except admits that Berg acted as U.S. distributor of certain products spun off from Plaintiff to HealthTech BioActives SLU.

13.     Admits the allegations contained in paragraph 13 of the Complaint.

4

14.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Complaint and therefore denies same, except admits that Berg continued to distribute Xerenoos after the July 2019 spin-off.

15.    Denies each and every allegation contained in paragraph 15 of the Complaint, except admits that as of January 2020, Berg had stock of Xerenoos in its possession and informed Interquim that it would sell such stock to fulfill existing orders of Xerenoos from Berg's customers.

16.    Denies each and every allegation contained in paragraph 16 of the Complaint, except admits that Berg retained proceeds of its sales of Xerenoos as a set-off against monetary damages it incurred as a result of Interquim's breaches of the Distribution Agreement.

17.    Denies each and every allegation contained in paragraph 17 of the Complaint, except admits that as of December 2019 Berg possessed 1,843.825 kilograms of Xerenoos, which has since been sold.

18.    Denies each and every allegation contained in paragraph 18 of the Complaint, except admits that Berg sold 1,843.825 kilograms of Xerenoos for $619,760.55, which averages to $336 per kilogram.

19.    Denies each and every allegation contained in paragraph 19 of the Complaint.

5

20.     Denies each and every allegation contained in paragraph 20 of the Complaint.

21.     Denies each and every allegation contained in paragraph 21 of the Complaint, except admits that Berg has collected certain payments from end customers for Xerenoos that was sold by Berg and invoiced by Interquim, which amounts Berg has retained to set-off the monetary damages caused to it by Interquim's breaches of the Distribution Agreement.

22.     Denies each and every allegation contained in paragraph 22 of the Complaint, except admits that the amounts paid to Berg from end customers of Xerenoos that it has not remitted to Interquim total $727,200, which amount Berg has retained to set-off the monetary damages caused to it by Interquim's breaches of the Distribution Agreement.

23.     Paragraph 23 of the Complaint contains argument and legal conclusions to which no response is required. To the extent a response is required, Berg denies each and every allegation contained in paragraph 23 of the Complaint, except admits that "Berg has suffered damages in excess of $1.279 million . . . ."

24.     Denies each and every allegation contained in paragraph 24 of the Complaint.

## COUNT I – BREACH OF CONTRACT

25.     Admits the allegations contained in paragraph 25 of the Complaint.

6

26.     Admits the allegations contained in paragraph 26 of the Complaint.

27.     Denies each and every allegation contained in paragraph 27 of the Complaint.

28.     Denies each and every allegation contained in paragraph 28 of the Complaint.

29.     Denies each and every allegation contained in paragraph 29 of the Complaint.

## COUNT II – COMMON LAW CONVERSION

30.     Denies each and every allegation contained in paragraph 30 of the Complaint, except admits that Interquim provided Berg with a stock of Xerenoos that Berg could use to fulfill orders from end customers that Berg procured for the product.

31.     Denies each and every allegation contained in paragraph 31 of the Complaint, except admits that as of December 2019 Berg possessed 1,843.825 kilograms of Xerenoos, which it has since sold for $619,760.55.

32.     Denies each and every allegation contained in paragraph 32 of the Complaint.

33.     Denies each and every allegation contained in paragraph 33 of the Complaint.

7

34.     Denies each and every allegation contained in paragraph 34 of the Complaint, except admits that the amounts paid to Berg from end customers of Xerenoos that it has not remitted to Interquim total $727,200, which amount Berg has retained to set-off the monetary damages caused to it by Interquim's breaches of the Distribution Agreement.

35.     Denies each and every allegation contained in paragraph 35 of the Complaint.

36.     Denies each and every allegation contained in paragraph 36 of the Complaint.

37.     Denies each and every allegation contained in paragraph 37 of the Complaint.

## COUNT III – STAUTORY CONVERSION (MCL § 600.2919A)

38.     Denies each and every allegation contained in paragraph 38 of the Complaint, except admits that Interquim provided Berg with a stock of Xerenoos that Berg could use to fulfill orders from end customers that Berg procured for the product.

39.     Denies each and every allegation contained in paragraph 39 of the Complaint, except admits that as of December 2019 Berg possessed 1,843.825 kilograms of Xerenoos, which has since been sold for $619,760.55.

8

40.     Denies each and every allegation contained in paragraph 40 of the Complaint.

41.     Denies each and every allegation contained in paragraph 41 of the Complaint.

42.     Denies each and every allegation contained in paragraph 42 of the Complaint, except admits that the amounts paid to Berg from end customers of Xerenoos that it has not remitted to Interquim total $727,200, which amount Berg has retained to set-off the monetary damages caused to it by Interquim's breaches of the distribution agreement.

43.     Denies each and every allegation contained in paragraph 43 of the Complaint.

44.     Denies each and every allegation contained in paragraph 44 of the Complaint.

45.     Denies each and every allegation contained in paragraph 45 of the Complaint.

46.     Denies each and every allegation contained in paragraph 46 of the Complaint.

## **AFFIRMATIVE DEFENSES**

### **FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim upon which relief may be granted.

9

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the Statute of Frauds.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of waiver, estoppel and unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own material breaches and failure to perform under the Distribution Agreement.

## FIFTH AFFIRMATIVE DEFENSE

Defendant was excused from performance under the Distribution Agreement because of Plaintiff's anticipatory breach of same.

## SIXTH AFFIRMATIVE DEFENSE

Any damages suffered by Plaintiff are set off by monetary damages caused to Defendant by Plaintiff's breaches of the Distribution Agreement and Defendant did not breach the Distribution Agreement by withholding amounts paid to Berg from end customers of Xerenoos as a setoff against amounts owed by Plaintiff to Defendant resulting from Plaintiff's breach of the Distribution Agreement.

In addition to the foregoing defenses, Defendant retains the right to amend its Answer to raise additional affirmative and other defenses.

## DEFENDANT/COUNTERCLAIM-PLAINTIFF
## BERG IMPORTS, LLC'S COUNTERCLAIM AGAINST INTERQUIM

## NATURE OF COUNTERCLAIMS

1.      Defendant/Counter-Plaintiff Berg Imports, LLC, d/b/a Berg Nutrition

LLC ("Berg") asserts counterclaims for breach of contract and civil conspiracy

against Plaintiff/Counter-Defendant Interquim, S.A. ("Interquim").  The

counterclaims derive from the bad faith conduct of Interquim, which encouraged

Berg to expend resources to build a market in the United States for the distribution

of Interquim's citicoline product, only to terminate the distribution arrangement at

the direction of its parent, Grupo Ferrer Internacional, S.A. ("Ferrer"), just when

Berg's efforts were about to achieve fruition.  The termination was not effected for

legitimate business reasons, but was the result of Ferrer's collusion with its

Japanese supplier to divide the world market for citicoline products by abandoning

the domestic market in return for a guaranteed supply of citicoline for Ferrer's

profitable worldwide business.

## THE PARTIES

2.      Berg is a Michigan limited liability company with its principal place

of business in Ann Arbor, Michigan.

3.      Upon information and belief, Interquim is a Spanish corporation with

its principal place of business in Barcelona, Spain.

11

## JURISDICTION

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000 and the action is between "citizens of a State and citizens or subjects of a foreign state." Berg is citizen of Michigan and Interquim is a citizen of Spain.

5.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Berg is a resident of this judicial district.

## BACKGROUND

6.     These counterclaims involve the global manufacture, distribution and sale of a raw material called citicoline, which is a dietary supplement in some countries and an active pharmaceutical ingredient in others.

7.     Citicoline is the generic name of a pharmaceutical substance that is identical to a naturally-occurring brain chemical (CDP-choline). Clinical trials indicate that citicoline has neuroprotective properties that can enhance or improve attention, focus and recall.

8.     Citicoline is taken as a dietary supplement under various brand names to support memory and acuity during aging, improve vision in people with glaucoma, and help with recovery in stroke patients.

12

9.      Ferrer is a privately-held multi-national biotechnology company that manufactures and sells a variety of pharmaceutical, health and food products, which include citicoline as a primary ingredient.

10.     Upon information and belief, Ferrer's largest supplier of citicoline for sale outside of the United States is Kyowa Hakko Bio Co., Ltd., a biotechnology company based in Tokyo, Japan.

11.     Kyowa Hakko Bio Co., Ltd., through its United States subsidiary Kyowa Hakko U.S.A., Inc., also sells citicoline in the United States under the brand name COGNIZIN®. The Japanese parent and its U.S. subsidiary are collectively referred to herein as "Kyowa Hakko."

12.     In or around 2014, Ferrer decided to sell citicoline in the United States under the brand name Xerenoos through its wholly owned subsidiary, Interquim.

13.     The citicoline used for Xerenoos was manufactured and supplied by Interquim (not Kyowa Hakko) creating a conflict of interest for Ferrer. On the one hand, Ferrer was competing with Kyowa Hakko with the sale of Xerenoos in the United States through its subsidiary, Interquim. On the other hand, Ferrer was partnering with Kyowa Hakko by acquiring citicoline from it for sale outside the United States.

14.     Ferrer's conflicted and compromised position would ultimately lead to the contractual breaches and tortious conduct described herein.

13

## The Distribution Agreement

15.     Interquim and Berg had a long-term relationship whereby Berg was the exclusive distributor of Interquim products in the United States.

16.     Beginning in 2014, Interquim entered into an oral distribution agreement with Berg, whereby Berg would also serve as the exclusive distributor of Xerenoos in the United States (the "Distribution Agreement").

17.     Under the Distribution Agreement, Berg would receive a 5% commission on all Xerenoos sales in the United States.

18.     A material element of the Distribution Agreement was that Berg would attempt to build a market for Xerenoos in the United States and devote the resources necessary to overcome competitive and other obstacles. In order to accomplish this goal, the parties recognized that significant resources would have to be expended by Berg in order for this new product to penetrate the U.S. market.

19.     The parties also acknowledged and understood that the Distribution Agreement necessarily was a long-term arrangement in order to allow Berg to develop the U.S. market and provide it with an opportunity to realize on its investment and earn a reasonable profit from the business.

20.     Specifically, the parties understood and expected that it would take Berg years to ramp-up the business, develop a market for Xerenoos and launch the product (the "Startup Period.")

14

21.     In reliance upon the foregoing understandings, and at Interquim's express instruction and encouragement, Berg expended significant resources in terms of financial support and sweat equity to enter the U.S. market and build a solid foundation for the domestic distribution of Xerenoos.

22.     Since Berg was only paid on a commission basis, it was never compensated for its time and expenses during the Startup Period, but expected to recoup its expenses and realize a profit once a market had been developed.

**Kyowa Hakko Interferes with Xerenoos**

23.     In an attempt to prevent Xerenoos from gaining a foothold in the United States and competing with its own citicoline product (COGNIZIN®), Kyowa Hakko commenced an intimidation and misinformation campaign against Xerenoos.

24.     Kyowa Hakko exerted a full-court press to create obstacles for Berg to penetrate the U.S. market.  First, it enlisted lawyers to accuse Berg of misleading conduct by failing to disclose the presence of certain ingredients in Xerenoos, which Kyowa Hakko falsely alleged were "unapproved" in the United States and could not be lawfully sold. Second, it posted an article for public distribution repeating the false allegations concerning the chemical structure of Xerenoos. Third, it continuously pressured Ferrer to quash the U.S. distribution of Xerenoos to reduce competition.

15

## <u>Berg Builds a Market for Xerenoos</u>

25.    Despite the competitive obstacles faced by Berg and the interference of Kyowa Hakko, Berg succeeded in building a U.S. market for Xerenoos.

26.    After modest sales during the Startup Period (2014-2016), which was expected by the parties, Xerenoos sales grew substantially between 2017 and 2019.

27.    Xerenoos revenues in 2017-19 were $364,065, $465,985 and $920,558, respectively, as illustrated by the below bar graph:



28.    Thus, beginning in 2019 Berg began realizing meaningful profits derived from its commission earnings.

16

29.    During this period of time from 2014-2019, Interquim instructed and encouraged Berg to continue to aggressively promote and sell Xerenoos throughout the United States.  At no point did Interquim express serious disappointment or concern over Berg's performance nor did it indicate it would terminate the arrangement if matters did not improve.

30.    Interquim never shared with Berg any internal sales projections nor did it advise Berg that internal sales projections had not been met. To the contrary, Interquim understood that it would take several years to build a market for Xerenoos in the United States, and Interquim was satisfied to let that process develop at Berg's expense.

31.    In fact, each year during this period, Berg provided Interquim with its budget for the following year, which Interquim approved without objection or criticism.

### Interquim Terminates the Distribution Agreement Without Justification

32.    By July 2019, Ferrer and Interquim decided to exit the U.S. market for Xerenoos and cease supplying Berg with citicoline.  This decision was kept secret from Berg, and Interquim continued to encourage Berg to expand the market for Xerenoos.

33.    At that time, Berg was informed that Interquim activities would be transferred to HealthTech BioActives S.L.U. ("HTBA") as part of a spin-off of

17

Interquim into HTBA.  Berg was not told that Xerenoos would remain with Interquim and excluded from the transfer of other Ferrer products to HTBA nor was Berg advised that there would be any change in the existing distribution arrangement for Xerenoos.  Starting in December 2019, Interquim made repeated inquiries to Berg about the amount of product Berg maintained in stock.

34.     It was not until January 13, 2020, just as Berg was poised to reap the benefits of Xerenoos sales, that Interquim notified Berg for the first time that it would discontinue providing Berg with citicoline for the U.S. market.

35.     Although Interquim provided no formal or informal termination notice, it demanded that Berg account for and return its remaining citicoline inventory to Interquim.

36.     Interquim provided no reason or justification for its termination of the Distribution Agreement. In fact, Interquim terminated the Distribution Agreement for improper purposes, as set forth below, demonstrating that it acted in bad faith contrary to its contractual obligations.

37.     Interquim's bad faith termination of the Distribution Agreement frustrated the opportunity for Berg to recoup its investment and denied Berg a chance to turn its substantial marketing efforts over the previous six years into a profitable distribution enterprise.

38.     But for Interquim's bad faith breach of the Distribution Agreement, Berg would have increased its sales to its existing customers and captured additional market share.  Berg expected to sell approximately $48 million in Xerenoos product for the period 2020-2025, which would have produced $2.4 million in commissions.

39.     Berg satisfied existing orders for Xerenoos in 2020 for $727,200 and sold its remaining Xerenoos inventory for $619,760.55. Berg has retained these amounts on account as a partial set-off against the monetary damages caused to it by Interquim's bad faith termination of the Distribution Agreement.

### The Agreement is Breached due to Pressure From Kyowa Hakko

40.     Interquim now claims in this action for the first time that it terminated the Distribution Agreement because sales of Xerenoos did not meet its expectations. This post hoc justification is without basis.

41.     The parties agreed and understood that there would be limited sales of Xerenoos during the Startup Period when Berg committed efforts and resources to launch, ramp-up and build a market for Xerenoos in the U.S. At no point did Interquim express any serious concerns about Xerenoos sales, which nearly *tripled* from 2017-2019. At all relevant times, Interquim encouraged Berg's promotion, marketing and sales efforts.

19

42.    Upon information and belief, Kyowa Hakko pressured Ferrer and Interquim, to terminate the Distribution Agreement so that COGNIZIN® could dominate the citicoline market in the United States.

43.    Ferrer finally gave in to the relentless pressure being exerted by Kyowa Hakko and colluded with Interquim to terminate the Distribution Agreement in order to cede the United States market for citicoline to Kyowa Hakko.

44.    Although U.S. sales of Xerenoos were steadily growing, during the time period of 2014-2019, Ferrer sold more than $500 million worth of citicoline products outside of the United States.  The citicoline for these international sales by Ferrer was largely supplied by Kyowa Hakko. Thus, upon information and belief, in order to maintain its supply relationship with Kyowa Hakko for the sale of citicoline outside the United States, Ferrer bowed to pressure exerted by Kyowa Hakko and colluded with Interquim to exit the U.S. market by discontinuing the supply of citicoline to Berg and effectively terminating the Distribution Agreement.

45.    Interquim's claim that Xerenoos sales did not meet projections or expectations is a pretext for the anti-competitive arrangement between Ferrer and Kyowa Hakko, which is the real reason Interquim terminated the Distribution Agreement.

## COUNT I: BREACH OF CONTRACT

46.     Berg repeats and realleges the allegations in Paragraphs 1 through 45 above as if fully set forth at length herein.

47.     The Distribution Agreement was a valid and binding contract between Interquim and Berg.

48.     In every contract there exists an implied covenant of good faith and fair dealing that neither party may do anything which would have the effect of destroying or injuring the right of the other party to receive the fruits and benefits of the contract.

49.     The parties acknowledged and understood that the Distribution Agreement was a long-term arrangement in order to allow Berg to build a U.S. market for Xerenoos and to provide Berg with an opportunity to realize on its investment and earn a reasonable profit from the business.

50.     Interquim materially breached the Distribution Agreement and the covenant of good faith and fair dealing implied therein by terminating the Distribution Agreement without notice and without commercial justification for the sole purpose of ceding the citicoline market in the United States to Kyowa Hakko, thereby destroying and injuring Berg's right to receive the fruits of the contract.

51.     As a direct and proximate cause of Interquim's bad faith termination of the Distribution Agreement, Berg suffered monetary damage in an amount in

excess of $1,000,000, after crediting Interquim with the amounts Berg collected on account as set forth in paragraph 39 above.

## COUNT II: CIVIL CONSPIRACY

52.     Berg repeats and realleges the allegations in Paragraphs 1 through 51 above as if fully set forth at length herein.

53.     Ferrer and Kyowa Hakko shared a common design and purpose to create a monopoly and/or restraint on trade by eliminating Xerenoos as a competitor to COGNIZIN® in the United States.

54.     Upon information and belief, Ferrer colluded with Interquim to wrongfully terminate its Distribution Agreement with Berg in exchange for Kyowa Hakko's promise to continue supplying Ferrer with citicoline for sale outside of the United States.

55.     The conspiracy formulated and participated in by Interquim and Ferrer was undertaken with malice and without justification in law to achieve the anticompetitive effect of suppressing competition in the U.S. market.

56.     As a direct and proximate result of Ferrer and Interquim's conspiracy to create a monopoly and restraint on trade, Berg was denied the fruits and benefits of its Distribution Agreement with Interquim, and has been damaged in an amount in excess of $1,000,000.

57.     Ferrer and Interquim are jointly and severally liable as co-conspirators.

## **JURY DEMAND**

Defendant/ Counterclaim-Plaintiff relies on Plaintiff/Counter-Defendant's jury demand and demands a jury trial on all issues so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Defendant/Counter-Plaintiff Berg demands judgment dismissing the claims asserted by Interquim and further demands judgment on its counterclaims as follows:

A.     Against Interquim on Count I in an amount to be determined at trial, but not less than $1,000,000.

B.     Against Interquim on Count II, in an amount to be determined at trial, but not less than $1,000,000, plus punitive damages.

C.     On all Counts, prejudgment interest, the costs and disbursements of this action and for any other relief that his Court deems just and proper.

Dated:          May 12, 2021

                                        Respectfully submitted,

                                        **THE DRAGICH LAW FIRM PLLC**

                                        */s/ January A. Dragich*
                                        David G. Dragich (P63234)
                                        January A. Dragich (P63108)
                                        17000 Kercheval, Suite 210
                                        Grosse Pointe, MI 48230
                                        (313) 886-4550
                                        ddragich@Dragichlaw.com
                                        jdragich@Dragichlaw.com

                                                - and -

                                        **KANE KESSLER, P.C.**

                                        */s/ Jeffrey H. Daichman*
                                        Jeffrey H. Daichman
                                        Jonathan M. Sabin
                                        600 Third Avenue
                                        New York, New York 10016
                                        (212) 541-6222
                                        jdaichman@kanekessler.com
                                        jsabin@kanekessler.com

                                        *Attorneys for Defendant/Counter-Plaintiff*