UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

INTERQUIM, S.A.,

    Plaintiff/Counter-Defendant,

v.                                                              Case No. 21-10665

BERG IMPORTS, LLC,

    Defendant/Counter-Plaintiff/
    Third-Party Plaintiff,

v.

GRUPO FERRER
INTERNACIONAL, S.A.,

    Third-Party Defendant.
_____/

**OPINION AND ORDER GRANTING INTERQUIM'S MOTION TO DISMISS AND GRANTING GRUPO FERRER INTERNACIONAL'S MOTION TO DISMISS**

Plaintiff Interquim, S.A. is a Spanish corporation that develops, manufactures, and markets dietary and nutritional supplements and other pharmaceutical products. Interquim brings this action against Berg Imports, LLC for breach of contract, common law conversion, and statutory conversion under Michigan law. (ECF No. 1, PageID.6-9.) According to Interquim, Berg breached an oral distribution agreement under which Berg acted as the United States distributor of a particular product. (ECF No. 1, PageID.1-2.)

Berg filed a counterclaim against Interquim for breach of contract (ECF No. 13, PageID.66-78) and a third-party complaint against Interquim's parent company, Grupo Ferrer Internacional, S.A., for tortious interference with contract and civil conspiracy. (ECF No. 14, PageID.94-96.) Before the court are Interquim's (ECF No. 19) and Grupo

Ferrer's (ECF No. 20) motions to dismiss claims brought by Berg. The matters have been fully briefed (ECF Nos. 23, 24, 26, 27, 28, 29), and the court does not find a hearing to be necessary. E.D. Mich. LR 7.1(f)(2). For the reasons stated below, the court will grant both motions.

## I. BACKGROUND

The following facts are either alleged in Plaintiff's complaint or agreed upon by the parties. In a motion to dismiss, the court accepts Plaintiff's factual allegations as true but makes no overt finding as to truth or falsity. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Grupo Ferrer is a multinational biotechnology company that manufactures and sells various pharmaceutical and dietary products, including citicoline. (ECF No. 13, PageID.68.) Citicoline is a dietary supplement that is used for, *inter alia*, its "neuroprotective properties that can enhance or improve attention, focus and recall." (*Id.*, PageID.67.) In approximately 2014, Interquim, Grupo Ferrer's wholly owned subsidiary, began manufacturing and selling citicoline under the brand name Xerenoos. (*Id.*, PageID.68.)

In 2014, Interquim and Berg entered into an oral distribution agreement, whereby Berg would serve as the "exclusive distributor of Xerenoos in the United States." (*Id.*, PageID.69.) Under the distribution agreement, "Berg would attempt to build a market for Xerenoos in the United States," and Berg maintains that "the parties recognized that significant resources would have to be expended by Berg in order for this new product to penetrate the U.S. market." (*Id.*) The contract, according to Berg, "necessarily was a long-term arrangement" and that the parties understood "it would take Berg years to

2

ramp-up the business, develop a market for Xerenoos and launch the product," particularly during a "Startup Period." (*Id.*, PageID.69-70*.*) Berg expended significant resources in their efforts to distribute Xerenoos during the Startup Period, which occurred between 2014 and 2016. (*Id.*, PageID.70.) The terms of the parties' contract were simple: under the distribution agreement, Interquim provided Xerenoos to Berg, and Berg was paid on a commission basis, earning 5% on all Xerenoos sales in the United States. (*Id.*, PageID.69-70.)

Grupo Ferrer utilizes additional suppliers of citicoline in its global business endeavors. (*Id.*, PageID.68.) Its largest supplier of citicoline for sale outside of the United States is a biotechnology company called Kyowa Hakko Bio Co., based in Tokyo, Japan. (*Id.*) Kyowa Hakko, through a subsidiary, also sells citicoline in the United States under the brand name Cognizin. (*Id.*) Thus, Grupo Ferrer was "competing with Kyowa Hakko with the sale of Xerenoos in the United States through its subsidiary, Interquim," while at the same time "partnering with Kyowa Hakko by acquiring citicoline from it for sale outside the United States." (*Id.*)

According to Berg, Kyowa Hakko commenced "an intimidation and misinformation campaign against Xerenoos" in order to prevent Xerenoos "from gaining a foothold in the United States." (*Id.*, PageID.70) This included accusing Berg of failing to disclose the presence of "unapproved" ingredients in Xerenoos and posting a public article that made false statements about the chemical structure of Xerenoos. (*Id.*) Furthermore, Kyowa Hakko allegedly "continuously pressured [Grupo] Ferrer to quash the U.S. distribution of Xerenoos to reduce competition." (*Id.*) However, despite these obstacles, Berg "began realizing meaningful profits derived from its commission

3

earnings" under the distribution agreement. (*Id,* PageID.71.) Between 2017 and 2019, Berg's revenues were $364,065, $465,985, and $920,558, respectively. (*Id.*) Interquim expressed no serious concerns with Berg's performance during this time period, nor did it indicate any intention of terminating the parties' agreement if sales did not improve. (*Id.*, PageID.72.)

In July 2019, Interquim began transferring its business activity to a new entity, HealthTech BioActives "as part of a spin-off of Interquim" into HealthTech BioActives. (*Id.*, PageID.73.) Interquim, however, continued to oversee Xerenoos. (*Id.*) Interquim did not inform Berg of any changes to their distribution agreement until January 13, 2020, when Interquim informed Berg that it would cease providing Berg with citicoline for sale in the United States. (*Id.*) No "notice" or "commercial justification" was given to Berg, and Interquim asked Berg to "account for and return its remaining citicoline inventory to Interquim." (*Id.*)

Pointing to the lack of advance notice and commercial justification, Berg maintains that the contract was terminated in bad faith. (*Id.*, PageID.74-76.) Consequently, it decided to satisfy existing orders in 2020 for Xerenoos for $727,200, and it further sold its remaining inventory of Xerenoos for $619,760.55. (*Id.*, PageID.74.) These amounts were retained "as a partial set-off against the monetary damages" suffered by the termination of the distribution agreement. (*Id.*) Berg alleges that Interquim's termination was in bad faith because "Kyowa Hakko pressured Ferrer and Interquim" so that Cognizin could dominate the United States citicoline market. (*Id.*, PageID.75.) As to Grupo Ferrer, Berg argues "in order to maintain its supply relationship with Kyowa Hakko for the sale of citicoline outside the United States, [Grupo] Ferrer

4

bowed to pressure exerted by Kyowa Hakko and colluded with Interquim to exit the U.S. market by discontinuing the supply of citicoline to Berg" and terminating the distribution agreement between Interquim and Berg. (*Id.*) And although Interquim maintains that "Xerenoos sales did not meet projections or expectations," Berg claims that this justification for termination was a pretext for an "anti-competitive arrangement between [Grupo] Ferrer and Kyowa Hakko." (*Id.*)

Interquim filed an action on March 26, 2021, bringing breach of contract and conversion claims against Berg for wrongfully retaining Xerenoos inventory and withholding profit on its sales; it has demanded payment, "minus a 5% commission for Berg" that it is still willing to pay. (ECF No. 1, PageID.5-9.) In its answer, Berg brought a counterclaim against Interquim for breach of contract[1] (ECF No. 13, PageID.66-78) and also filed a third-party complaint against Grupo Ferrer for tortious interference with contract and civil conspiracy. (ECF No. 14, PageID.94-96.)

## II. STANDARD

Under Rule 12(b)(6), a party can move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When reviewing motions under Rule 12(b)(6), the complaint is viewed in the light most favorable to the non-moving party, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "To survive a motion to dismiss, a complaint must contain factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*,

---

[1]  Berg's answer originally included an additional counterclaim for civil conspiracy against Interquim but has withdrawn that claim. (ECF No. 23, PageID.262 ("Berg hereby withdraws its counterclaim for civil conspiracy.").)

5

556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The plaintiff must present "more than labels and conclusions." *Twombly*, 550 U.S. at 545. "[A] formulaic recitation of a cause of action's elements will not do." *Id.*

When reviewing a motion to dismiss, the court "may not consider matters beyond the complaint." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009). However, the court may consider "documents incorporated into the complaint by reference . . . and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court may also consider "a document that is not formally incorporated by reference or attached to a complaint" when "[the] document is referred to in the complaint and is central to the plaintiff's claim." *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999).

### III. DISCUSSION

#### A. Interquim's Motion to Dismiss

The crux of Interquim's argument is that Berg's breach of contract counterclaim fails as a matter of law because "an oral agreement is generally terminable at will." (ECF No. 19, PageID.128.) Thus, according to Interquim, it was free to terminate the distribution agreement without any advance notice. (*Id.*) Berg argues it has stated a claim for breach of contract based on Interquim's bad faith termination—specifically, it claims that the implied covenant of good faith and fair dealing "imposes a limit upon

6

[Interquim's] discretion to terminate the Agreement" and that Interquim breached this covenant. (ECF No. 23, PageID.268-69.) Interquim counters that the implied covenant does not apply under the present circumstances and that Berg is attempting to "override" the parties' decision to avoid explicitly defining "a manner for, or conditions to, termination." (ECF No. 27, PageID.337.)

The parties appear to agree that under Michigan law, an oral agreement that does not provide a manner of termination is generally terminable at will by either party. *See, e.g.*, *Lichnovsky v. Ziebart Int'l Corp.*, 324 N.W.2d 732, 738-39 (Mich. 1982) ("[W]here the parties have not agreed upon the term, duration, or manner of termination of such an agreement it is generally deemed to be terminable at the will of either party because they have not agreed otherwise."). The core issue, however, is whether Michigan courts entertain actions for breaches of the implied covenant of good faith and fair dealing under the present circumstances, and, if they do, whether Interquim's actions constituted a breach of the covenant.

The covenant of good faith and fair dealing is a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v. United of Oakland, Inc.*, 483 N.W.2d 652, 655 (Mich. Ct. App. 1992). Generally, to invoke the implied covenant, "a litigant must show that a party breached the underlying contract itself." *Gay v. Fannie Mae*, No. 315868, 2014 WL 4215093, at *2 (Mich. Ct. App. Aug. 26, 2014) (citing *In re Leix Estate*, 797 N.W.2d 673, 683 (Mich. Ct. App. 2010)). The focus is on "the manner in which the agreement or other duty is performed or enforced." *PTN-NRS, LLC v. Cty. of Wayne*, No. 332135, 2017 WL 4447016, at *3 (Mich. Ct. App. Oct. 5, 2017) (citing

*Ferrell v. Vic Tanny Int'l, Inc.*, N.W.2d 669, 672-73 (1984)). Thus, while there is no independent action for breach of the implied covenant, "Michigan recognizes that an enforceable implied covenant of good faith and fair dealing arises when one party to a contract makes its performance a matter of its own discretion." *Bd. of Trustees of City of Birmingham Employees' Ret. Sys. v. Comerica Bank*, 767 F. Supp. 2d 793, 805 (E.D. Mich. 2011) (citing *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003) (applying Michigan law)); *accord Burkhardt v. City Nat. Bank of Detroit*, 226 N.W.2d 678, 680 (1975) ("Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith."). "Discretion arises when the parties have agreed to defer decision on a particular term of the contract," or "from a lack of clarity or from an omission in the express contract." *Stephenson*, 328 F.3d at 826 (quoting *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873, 876 (5th Cir. 1989) (applying Michigan law)). In either of these scenarios, the defining feature is that "the dependent party must rely on the good faith of the party in control," and "[o]*nly in such cases* do the courts raise explicitly the implied covenant of good faith and fair dealing, or interpret a contract in light of good faith performance." *Id.* (quoting *Hubbard*, 873 F.2d at 877 n.2).

Berg argues that Interquim abused its "sole discretion" to terminate the distribution agreement which led to the destruction of Berg's rights to receive the fruits of the contract. (ECF No. 23, PageID.270, 272.) According to Berg, terminating the contract without allowing it to reap the fruits and benefits of its contract was a "classic breach of the covenant of good faith and fair dealing." *Id.* However, the court is not

8

convinced that Michigan applies the covenant in these circumstances, and Berg's theory that the contract was breached on this basis fails. None of the cases cited by Berg stand for the proposition that the implied covenant of good faith and fair dealing applies where both parties have a right to terminate a contract at will.[2] Rather, all of the cases revolve around ensuring that a party's sole discretion in performing a specific duty under a contract is done so in good faith. *See Reliance Ins. Co. v. Triss Corp.*, No. 06-11548, 2008 WL 1925054, at *3 (E.D. Mich. Mar. 1, 2008) (applying the implied covenant where contract expressly permitted insurance company, on behalf of insured plaintiff, to "investigate and settle any claim or 'suit' as [it] consider[s] appropriate"); *DGD Processing Solutions, LLC v. MD Fin., LLC*, No. 14- CV-13740, 2016 WL 3165702, at *7 (E.D. Mich. Jun. 7, 2016) (permitting claim for breach of implied covenant where party had discretion to hold funds in a reserve account "for up to 180 days"); *Harp v. Equilon Enterps., LLC,* No. 302084, 2012 WL 975050 (Mich. Ct. App. Mar. 22, 2012) (finding a "facially cognizable" claim for party's breach of implied covenant where written contract stated a party had "sole discretion" to determine pricing

---

[2]   In *J.R. Watkins Co. v. Rich*, the Michigan Supreme Court held that a "provision in a contract for termination at the option of a party is valid. But where the relationship is commercial and does not involve fancy, taste, sensibility, judgment, or other personal features, the option may be exercised only in good faith." 235 N.W. 845, 846 (Mich. 1931). Since this opinion in 1931, however, "later decisions have indicated that the basis behind the *Watkins* decision was the lack of good faith on the part of the company *at the time it entered into the . . . contract*. Accordingly, the courts have limited the good faith rule announced in *Watkins* to situations where one of the parties lacked good faith at the time he or she bargained for the termination right." *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 938 (6th Cir. 1989) (emphasis added) (citing *Busam Motor Sales v. Ford Motor Co.*, 203 F.2d 469 (6th Cir. 1953)); *see also Bushwick-Decatur Motors v. Ford Motor Co.*, 116 F.2d 675, 676 (2d Cir. 1940) (applying Michigan law). Berg has not alleged bad faith at the time the parties entered into their distribution agreement.

9

methods under agreement); *Faber v. FJH Music Co., Inc.*, No. 06-12669, 2007 WL 1098259, at *5 (E.D. Mich. Apr. 11, 2007) (finding applicability of implied covenant between composer and publishing company where defendants were "required to market, promote and exploit Plaintiffs' publications" but had complete "discretion to decide not to publish Plaintiffs' submitted publications") (applying Florida law).

And, crucially, it is clear in all of these cases that there is a "dependent party" whose ability to reap the fruits of the contract is contingent on the independent party's good faith efforts in performance of a particular duty. Here, by contrast, the parties' contract provides only that Interquim would provide Berg with Xerenoos to sell in the United States in exchange for 5% commission; in the absence of any agreement to the contrary, both parties had an equal right to terminate the contract under Michigan law without any notice.[3] *Cf. Dunn v. Goebel Brewing Co.*, 99 N.W.2d 380, 383 (Mich. 1959) (holding that an oral distribution agreement with no specified duration was "one existing at will" and was subject to termination without notice); *Maida v. Ret. & Health Servs. Corp.*, 795 F. Supp. 210, 214 (E.D. Mich. 1992) (finding implied covenant does not apply where contract expressly stated *both* parties "reserved the right 'in their sole discretion' to terminate the Agreement"), *aff'd*, 36 F.3d 1097 (6th Cir. 1994); *Polimeni v.*

---

3   Notably, Berg has not alleged that Interquim is withholding any commission payments that Berg is actually owed. Thus, under the terms of their agreement, Berg is not being denied "the fruits and benefits of the contract" as it contends. (ECF No. 13, PageID.76.) Indeed, Berg's assertion is belied by its statement in the Third-Party Complaint that "in 2019 Berg began realizing meaningful profits derived from its commission earnings." (*Id.* PageID.72.) Had the parties contemplated that the contract would continue for a *particular duration*, or perhaps if the agreement had been terminated during the defined Startup Period, Berg's position that it has been denied the benefits of the contract would potentially be cognizable; however, the parties agreed to pay Berg only on a commission basis for its sales and for an indefinite amount of time.

10

*Gen. Motors Corp.*, No. 274419, 2007 WL 1791894, at *3 (Mich. Ct. App. June 21, 2007) ("[E]ven assuming an oral contract was created, because Polimeni admitted that terms for duration or termination of the contract were never discussed, the contract was terminable at will by either party. Accordingly, GM was entitled to discontinue using Polimeni's services at any time and Polimeni was not entitled to a lifetime contract."). The court therefore cannot conclude this is a "classic" implied covenant of good faith and fair dealing case.

But even if the implied covenant did apply, the most analogous case presented by the parties makes clear that, as a matter of law, Berg's counterclaim fails. In *Erickson's Flooring & Supply Co. v. Tembec, Inc.*, 212 F. App'x 558, 561 (6th Cir. 2007), the Sixth Circuit addressed whether, under Michigan law, the termination of an oral exclusive distribution agreement was terminable only for just cause or could be terminated only with notice. The *Erickson's Flooring* court began its analysis by making clear that "contracts for an indefinite term that do not contain a provision regarding the manner in which the contract may be terminated are terminable at will." *Id.* (citing *Lichnovsky*, 324 N.W.2d at 738-39). It found that the plaintiff failed to come forward with enough evidence proving that the parties' contract could not be terminated at will or with advance notice. *Id.* The Sixth Circuit considered, alternatively, whether there was a breach of the implied covenant of good faith and fair dealing. *Id.* at 562. The court explained:

> Erickson's also argues that the contract included an implied covenant of good faith and fair dealing. *Even if this is so*, Erickson's presents no evidence that Tembec violated this covenant. *The implied covenant of good faith and fair dealing does not require termination only for cause, or termination only with advance notice*. Yet *these are the only actions* by

11

      Tembec that Erickson's can point to as violating this claimed implied covenant.

*Id.* (emphasis added). Like the plaintiff in *Erickson's Flooring*, Berg's complaint alleges that that the covenant of good faith and fair dealing required "commercial justification" and "notice" before Interquim could terminate their agreement. (ECF No. 13, PageID.76.) But the opinion unambiguously holds that in Michigan, neither lack of advance notice nor lack of cause constitutes a breach of the implied covenant.

      Berg contends that the Sixth Circuit ruled this way because, on summary judgment, there was "no *evidence* that Tembec violated this covenant." (ECF No. 23, PageID.276.) Thus, in Berg's view, the *Erickson's Flooring* court found that "an oral distribution agreement that was terminable at will nevertheless contains an implied covenant of good faith and fair dealing." (*Id.*) However, the Sixth Circuit's holding stands for the proposition that, *even if* the implied covenant applied, it "does not require termination only for cause, or termination only with advance notice." *Erickson's Flooring*, 212 F. App'x at 561. Like in *Erickson's Flooring*, it is clear from Berg's complaint that "these are the only actions by [Interquim] that [Berg] can point to as violating this claimed implied covenant." *Id.*

      The court will therefore dismiss Berg's counterclaim against Interquim because taking the allegations as true, no breach of contract occurred. If Berg wanted provisions in their agreement addressing what would be necessary for termination of the agreement, "it could have insisted on the inclusion of those terms."[4] *See Gen. Aviation,*

---

4    Although Berg complains it "was never compensated for its time and expenses during the Startup Period," which occurred between 2014 and 2016 (ECF No. 13, PageID.71), Berg admits that it contracted to be paid only on a commission basis. Berg's unilateral expectation that it would maximize profit and recoup losses "once a

12

*Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1041 (6th Cir. 1990) (rejecting claim for breach of implied duty of good faith).

### B. Grupo Ferrer's Motion to Dismiss

Berg also brings a third-party complaint against Grupo Ferrer for tortious interference with contract and civil conspiracy. (ECF No. 14, PageID.94-96.) Grupo Ferrer moved to dismiss, arguing that (1) Berg's claims fail as a matter of law and (2) the court lacks personal jurisdiction over Grupo Ferrer. (ECF No. 20.) The court need not address the latter issue because, given the court's finding that Berg has failed to state a claim against Interquim for breach of contract, the court must also dismiss both the tortious interference with contract claim and the civil conspiracy claim.

In Michigan, the elements of tortious interference with contract are "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848-49 (2005). Berg cannot establish the second element because as previously explained, Interquim did not breach the contract by terminating it—in its complaint, Berg "points to no benefit that was due [to it] under the contract that [it] did not receive." *Rollison v. Kingsbury*, No. 320599, 2015 WL 4389767, at *1 (Mich. Ct. App. July 16, 2015). No allegation is made that Interquim is wrongfully withholding commission payments as the parties agreed; the basis of the alleged breach is that Interquim violated the implied covenant of good faith and fair dealing by not terminating

---

market had been developed" after 2016 does not give rise to a breach of contract claim. (*Id.*, PageID.69-71.) Berg notes that "[a]s expected by the parties, Xerenoos sales grew substantially between 2017 and 2019"—but the fact that Berg began benefiting under the agreement did not guarantee that the contract could be terminated only with advance notice and a commercial justification.

13

with advance notice or cause. (ECF No. 13, PageID.76.) Even if Berg can establish that that there was "wrongful" interference by its parent Grupo Ferrer, there was still no breach. While "tortious interference" claims may be actionable even for at will contracts, the facts of the complaint make clear that "at most, such conduct by [Grupo Ferrer] could potentially support a claim for tortious interference *with a business relationship or expectancy*, but not with tortious interference *with a contract*," which are two distinct causes of action. *See id.* at *1-2 (emphasis added); *Health Call*, 706 N.W.2d at 849 n.3 ("[T]o the extent that plaintiff claims tortious interference with a contract, as opposed to interference with a business relationship or expectancy, . . . the claim cannot survive because there is no assertion that Williams *breached* the home nursing contract."); *cf. Knight Enterprises v. RPF Oil Co.*, 829 N.W.2d 345, 348 (2013) (citing *Health Call*, 706 N.W.2d at 848-49) (finding trial court erred in framing plaintiff's tortious interference with contract claim as one for interference with a business relationship because they are distinct torts and plaintiff "specifically alleged" the former in the complaint). Because Berg has not alleged a breach of contract claim that can survive, it cannot meet the elements of a claim for tortious interference with contract. *See, e.g., Rollison*, 2015 WL 4389767, at *1; *see also Dzierwa v. Mich. Oil Co.*, 393 N.W.2d 610, 613 (1986) ("[S]ince plaintiff's employment contract was terminable at will, there could be no breach arising from its termination.").

      Finally, inasmuch as the court will dismiss the tortious interference with contract claim, it must also dismiss the civil conspiracy claim. "[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable, tort." *Early Detection Ctr., P.C., v. New York Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. 1986);

14

*accord Advoc. Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003) (dismissing conspiracy claim because underlying tortious interference claim was not actionable), *aff'd*, 693 N.W.2d 358 (Mich. 2005). Here, the basis of Berg's civil conspiracy claim is that Grupo Ferrer, through an anticompetitive conspiracy, tortiously interfered with Interquim and Berg's contract. (ECF No. 24, PageID.301 ("Because Berg has pleaded an actionable tort against [Grupo] Ferrer for tortious interference with contract . . ., Berg's civil conspiracy claim cannot be dismissed as a matter of law.").) Having decided that the tortious interference with contract claim will be dismissed, "the conspiracy theory must also fail." *See id.*; *Detroit Will Breathe v. City of Detroit*, 524 F. Supp. 3d 704, 710 (E.D. Mich. 2021) ("[A] conspiracy claim is only actionable if the underlying conduct the defendants are accused of is also actionable."); *see also McKesson Medical-Surgical Inc. v. Micro Bio-Medics, Inc.*, 266 F. Supp. 2d 590, 600 (E.D. Mich. 2003) (dismissing civil conspiracy claim because the court dismissed the underlying trade secret action). The court will therefore dismiss the third-party complaint in its entirety.

### IV. CONCLUSION

Under Michigan law, Berg has not stated a claim against Interquim upon which relief can be granted. Taking Berg's facts as true, the allegations in its counterclaim make clear that the implied covenant of good faith and fair dealing does not support a breach of contract claim under these circumstances. Consequently, the claims in the third-party complaint against Grupo Ferrer necessarily fail. Accordingly,

IT IS ORDERED that Interquim's "Motion to Dismiss" (ECF No. 19) is GRANTED and Berg's counterclaim against Interquim is DISMISSED.

IT IS FURTHER ORDERED that Grupo Ferrer's "Motion to Dismiss" (ECF No. 20) is GRANTED and the Third-Party Complaint against Grupo Ferrer is DISMISSED.

        s/Robert H. Cleland
        ROBERT H. CLELAND
        UNITED STATES DISTRICT JUDGE

Dated:  March 14, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 14, 2022, by electronic and/or ordinary mail.

        s/Lisa G. Wagner
        Case Manager and Deputy Clerk
        (810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\21-10665.INTERQUIM.DismissCounterclaimsAndThirdPartyComplaint.MAZ.RHC.docx